UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dean Lange,

      Plaintiff,

v.

Bon Appetit Management Company,

      Defendant.

**MEMORANDUM OF LAW
AND ORDER**
Civil No. 14-784 (MJD/JSM)

_____

Adrianna H. Shannon, Shannon Law LLC, Counsel for Plaintiff.

David P. Graham and Kristina Kaluza, Dykema Gossett PLLC, Counsel for Defendant.

_____

This matter is before the Court on cross motions for summary judgment.

## I.  Background

Plaintiff worked for Defendant Bon Appetit Management Company ("BAMC") as a cook from April 2012 until his termination in February 2014.  In the Amended Complaint, Plaintiff has asserted claims of disability discrimination and reprisal under the Minnesota Human Rights Act ("MHRA") and the Americans with Disabilities Act ("ADA").  Plaintiff claims he was subjected to a hostile work environment and ultimately terminated by BAMC because of his

disability and because he complained about the harassment.

### A.    Plaintiff's Disability

Plaintiff alleges that beginning in the 1950's and for years thereafter, he was subjected to human experiments through Project MK Ultra - a program conducted under the direction and control of the Central Intelligence Agency ("CIA").  (Am. Comp. ¶ 11.)  This project involved the CIA's and the United States Military's research of mind control techniques.  (Id.)  Plaintiff further alleges that he enlisted in the Marine Corps when he was 17 years old and was stationed in Cambodia during the Viet Nam war.  (Id. ¶ 12.)  As a result of these experiences, Plaintiff alleges that he suffers from Post Traumatic Stress Disorder ("PTSD"), and that this disorder severely impacts a large number of major life activities.  (Id. ¶ 13.)  The record does not include any documentation that Plaintiff participated in the MK Ultra research project or in the military.  Plaintiff refused to talk about his military career during his deposition, claiming it is a matter of national security.  (Graham Decl. Ex. 4 (Plaintiff Dep. at 57, 61-63).)  In addition, when he was hired by BAMC, Plaintiff checked the box "Non Veteran" on the New Hire form.  (Id. Ex. 6.)

Plaintiff claims his physician at the Boynton Health Clinic diagnosed his PTSD in 1983. (<u>Id.</u>, Ex. 4 (Plaintiff Dep. at 63-64); Shannon Decl. Ex. 4 (Plaintiff's Answers to Interrogatories No. 4).)  No medical records have been submitted that specifically relate to the diagnosis or treatment of PTSD.  Instead, Plaintiff has submitted one medical record that concerns a fall he took in September 2007 where he hit his head on concrete and suffered a laceration on his chin.  (Shannon Decl. Ex. 3.)  The next medical record Plaintiff submitted concerns a doctor's visit in December 2014 concerning recurring episodes of syncope (fainting).  (<u>Id.</u>)  Both records list PTSD in the medical history portion, but it appears these references were based on Plaintiff's self-reports to the medical professional completing the medical record.  (<u>Id.</u>)

Plaintiff reports that he suffers from insomnia, severe nightmares, mood instability, obsessive thoughts about past traumatic events, depression and anxiety to the point of nausea.  (<u>Id.</u> Ex. 4 (Plaintiff's Answers to Interrogatories No. 4).)  He testified that he does not take any medications for PTSD.  (<u>Id.</u> Ex. 2 (Plaintiff Dep. at 171).)  He further testified that he does not have regular visits with a physician to treat his symptoms.  (<u>Id.</u> at 171-72.)

**B.      Employment with BAMC**

BAMC is a nationwide institutional food service company that serves

meals to students on campuses and to employees at corporate dining facilities.

BAMC operates the dining facilities at Macalester College where Plaintiff was

hired as a cook in April 2012.  (Graham Aff. Ex. 6.)  On his employment

application, Plaintiff provided an inaccurate employment history.  For example,

Plaintiff did not report that he had been terminated from previous positions and

that he believes a former manager tried to poison him.  (Id. Ex. 4 (Plaintiff Dep. at

35-36).)  Also, when hired, Plaintiff did not report that he suffered from PTSD or

provide any documentation that he suffered from PTSD at any time during his

employment.  (Id. Ex. 3 (LaChance Dep. at 36-38).)  Throughout the time Plaintiff

worked at BAMC, Plaintiff was provided BAMC's attendance and conduct

policies, the receipt of which he signed at least four times.  (Id. Ex. 7.)  One

BAMC policy is the Zero Tolerance Policy, which provides that it will tolerate no

discrimination or harassment on the basis of a protected status, including

religion, national origin and disability.  (Id. Ex. 8[1].)

---

[1]This policy provides:
It is the policy of [BAMC] to provide a work environment for all Associates that is free
from discrimination and harassment based on sex, sexual orientation, race, religion,

In February 2013, BAMC received an anonymous complaint on its toll-free

employee hotline that Sam Johnson, Sous Chef for BAMC, made disrespectful

comments to Plaintiff.  (Id. Ex. 1 (Driesch Dep. at 42, 58-61), Ex. 2 (Schartner Dep.

at 51).)  The complaint was forwarded to BAMC's Regional Human Resources

---

> color, disability, age, pregnancy, child birth or any related condition, national origin, veteran status, genetic information, or any other classification protected by law . . . Associates who, by act or omission, discriminate against or harass any Associate based upon such classifications shall be subject to disciplinary action, up to and including termination of employment.  Without limiting the applicability or coverage of this Policy to the conduct hereinafter described, the following conduct shall be deemed a violation of this Policy:
>
> \*\*\*
>
> 5.  Creating an intimidating, hostile, or offensive working environment by engaging in any of the following conduct or similar conduct that offends another Associate:
>
> \*\*\*
>
> (c) Sharing stories, jokes, experiences, or anecdotes that relate to sex, sexual orientation, race, religion, color, disability, age, pregnancy, child birth or any related condition, national origin, veteran status, genetic information, or any other unlawful basis;
>
> \*\*\*
>
> (f) Engaging in any conduct that tends to harass, annoy, or inflame another Associate, customer, or vendor including, but not limited to, the use of epithets, slurs, threats, intimidation, or hostile acts, based on sex, sexual orientation, race, religion, color, disability, age, pregnancy, child birth or any related condition, national origin, veteran status, genetic information, or any other classification protected by law.
>
> Retaliation against Associates who report any form of workplace discrimination or harassment, or who provide information concerning a complaint about discrimination or harassment, is strictly prohibited and will not be tolerated by the Company . . .

(Graham Aff. Ex. 8.)

Manager Beth Schartner.  (Id. Ex. 1 (Driesch Dep. at 62); Ex. 2 (Schartner Dep. at 51).)  During her investigation of the complaint, Johnson admitted to Schartner that he made comments to Plaintiff regarding the CIA that upset him, but that Plaintiff would bring the subject up in the first place.  (Shannon Decl. Ex. 11; Graham Aff. Ex. 2 (Schartner Dep. at 58-60, 162-63).)  Schartner recommended a final written warning be given to Johnson, but he resigned before the warning could be implemented.  (Graham Ex. 1 (Driesch Dep. at 160-62), Ex. 2 (Schartner Dep. at 63, 77), Ex. 3 (LaChance Dep. at 45-46).)  Schartner also talked with Plaintiff and recommended that he not bring up subjects that caused him to feel uncomfortable.  (Id. Ex. 2 (Schartner Dep. at 148, 162), Ex. 3 (LaChance Dep. at 73).)

In May 2013, Plaintiff was placed on temporary layoff for the summer closure of BAMC's operations at Macalester.   During the summer of 2013, Plaintiff made the first of two complaints to the St. Paul Department of Human Rights ("St. Paul DHR").  (Shannon Decl. Ex. 16.)  In the charge, Plaintiff claimed he was discriminated and harassed about his PTSD and his age and that he was involuntarily terminated in May 2013.  (Id.)  BAMC responded to the complaint, denying the charges.

Plaintiff claims that the harassment continued in the fall of 2013, this time from a BAMC employee named Jabari.  (Graham Aff. Ex. 2 (Schartner Dep. at 125-26), Ex. 4 (Plaintiff Dep. at 130-31).)  Plaintiff claimed that Jabari, who was a server, pushed him into the grill and otherwise bothered him by the things he said, and by staring at him.  (Id. Ex. 1 (Driesch Dep. at 53-54); Ex. 4 (Plaintiff Dep. at 129-31).)

On December 4, 2013, Plaintiff handed a letter to Terry Gorman, Macalester's head of security, in which he complained of the alleged harassment by his co-workers.  Also included in the letter are a number of unrelated, yet alarming comments, including:

- It Looks like I am stuck here until President Obama and Senator Klobuchar decide to pay me.
- Chef Paul implied that there are cameras in the back room.  Check with the Secret Service about this.
- Satan worshiper Dylan Beardsdahl poisoned me from 1987 to 2004 by working at the same Co-ops I did.
- G.H.W. (President Bush I) ordered [Dylan Beardsdahl] to kill me with poison.
- There's [sic] a satanic cult member and a real representative of Satan's demons told me I had been followed by them since July 27, 1960 when I was held in a [sic] electrified cage in Memorial Stadium U of M and killed a six year old special girl who had been held in the cage next to mine since July 20, 1960 while being raped with a cattle prod by Dr. Greene.

- I was being punished for not following G.H.W.'s orders to kill President Carter in 1979.
- And Satan has followed me here.
- He [Jabari] comes from Hati [sp] or Africa or somewhere.  I pretty sure he comes from HELL and by that I mean a very dark place.
- People like Ernie Kulas wants to be able to kill presidents and keep trying to get me locked up for life.

(Id. Ex. 5 (Gorman Dep. at 20-21), Ex. 9.)  In the letter, Plaintiff had also asked

Gorman not to talk with anyone from BAMC about his complaints, but on a

separate piece of paper included with the letter, Plaintiff wrote "Terry - Inside I

said don't talk to Bon Appetit but after sleeping on it I believe my life is in danger

from Jabari so use your best judgment, Dean."  (Id. Ex. 9.)

After receiving Plaintiff's letter, Gorman contacted BAMC's general

manager, Kimberly Driesch.  (Id. Ex. 5 (Gorman Dep. 15-16).)  Gorman also spoke

with Doug Rosenberg, a Macalester employee that manages the contract with

BAMC, about his concerns regarding Plaintiff's comments.  (Id. at 16.)

Prior to the end of the fall semester, Plaintiff spoke with his supervisor,

Paul Tonkinson and Kim Driesch, at which time Plaintiff asked that he be

transferred to Northwestern College.  (Shannon Decl., Ex. 5 (Driesch Dep. at 142);

Ex. 2 (Plaintiff Dep. at 193).)  Plaintiff believed that Northwestern would be a

better fit for him because he is a religious person, and Northwestern is a bible

college.  (Id. Ex. 2 (Plaintiff Dep. at 193).)  In response, Driesch told Plaintiff that

as it was the end of the semester, she would make a call to see if there were any

openings there following the return from the semester break,.  (Id. Ex. 5 (Driesch

Dep. at 142).)  Plaintiff then stated that he'd rather work with a bunch of Bible

thumpers than pagan sons and daughters.  (Id.)  Plaintiff admits to making the

statement, but said it was meant to be a joke, and that he was smiling when he

said it.  (Id. Ex. 2 (Plaintiff Dep. at 189).)

In early January 2014, the St. Paul DHR issued a probable cause

determination that Plaintiff had been subjected to harassment from Chefs Miller

and Johnson.  (Shannon Decl. Ex. 21.)  In its Memorandum of Findings, the St.

Paul DHR found that Johnson had repeatedly asked Plaintiff questions about his

military service and whether he had ever killed anyone.  Plaintiff responded that

he was in the military and had killed thousands, and that Johnson mocked

Plaintiff for this response, telling him he was full of crap.  (Id.)  On another

occasion, the St. Paul DHR found that Johnson threw flour at Plaintiff, for which

Miller yelled and screamed at Plaintiff.  (Id. Finding No. 7.)  Miller resigned

shortly after this occurrence took place.  (Id. Finding 5.)

Plaintiff also believed that Johnson was sent by the Inspector General of the Navy to harass him and that Johnson was with the CIA, and that as the federal government was behind Johnson, Plaintiff did not know who to turn to.  (Id. Finding 8 and 10.)

The St. Paul DHR further found that during BAMC's investigation of Plaintiff's harassment complaint, Plaintiff stated he was a former super soldier working for the government, and that his brother had been killed by the CIA. (Id. Finding 12.)  The St. Paul DHR also found that Plaintiff was not terminated in May 2013, but was placed on temporary layoff as BAMC did not operate at Macalester during the summer months.  (Id. Finding 15.)

The St. Paul DHR determined that sufficient evidence existed that Plaintiff had been harassed by Chefs Johnson and Miller regarding his PTSD and that such harassment was unwelcome and so severe as to cause Plaintiff to suffer emotional breakdowns.  (Id. at p.6.)  It also acknowledged that BAMC notified Johnson that he would be disciplined for his role in the treatment of Plaintiff, and that upon hearing the news, Johnson resigned the same day.  (Id.)

In the meantime, Gorman's concerns about Plaintiff's comments continued, prompting him to write a letter to Driesch documenting his concerns.  (Graham

Aff., Ex. 5 (Gorman Dep. at 18-20), Ex. 10.)  "I feel as Director of Safety and Security that Mr. Lange's behavior and moods are very erratic and that he may put others around him in danger or at the very least make co-workers or other community members fearful of this language and actions.  For these reasons, I recommend that Mr. Lange not be assigned to the Macalester College food service account."  (<u>Id.</u> Ex. 10.)

BAMC had also begun an investigation of Plaintiff's complaints against Jabari and of Plaintiff's inappropriate comments and the letter to Gorman.  (<u>Id.</u> Ex. 2 (Schartner Dep. at 128-31).)  Plaintiff was placed on paid administrative leave pending the conclusion of this investigation.  (<u>Id.</u> Ex. 3 (LaChance Dep. at 53, 83-84), Exs. 13, 14.)  The investigation was conducted by Schartner and Driesch, during which Driesch spoke with Plaintiff, Jabari, persons named by Plaintiff and Jabari as having knowledge of the complained of incidents and those that would have been working in the same area when the alleged harassment took place.  (<u>Id.</u> Ex. 2 (Schartner Dep. at 130-31).)

Many employees that were questioned reported to Driesch that Plaintiff made them uncomfortable or scared them with inappropriate comments.  For example, employee Betty Kirkpatrick stated she feels that Plaintiff is a "scary

person" because if something doesn't go right, you don't know how he would

react or whether he would explode.  (Id. Ex. 12.)  Barb Neudahl stated Plaintiff

scared her because of the things he talked about, and on one occasion, he kicked a

box across the floor and started swearing.  (Id.)  Another employee, Amy

Hungerford, stated that co-worker Mike Hill will not talk to Plaintiff, and that

another employee believed that Plaintiff would "come and shoot up this place."

Id.  Troy Kreitz also told Driesch that Plaintiff scares him and feels Plaintiff

"reminds me of someone who would come back and do retaliation if you said or

did something wrong."  (Id.)  None of these employees heard Plaintiff talk about

Jabari.  (Id.)

        Jabari was also questioned, and he denied bumping into Plaintiff or

mentioning Satan to him during any conversation.  (Id.)  He said that working

with Plaintiff can be rough, "because when Dean makes mistakes he can blow up

and sometimes swear."  (Id.)

        Following the investigation, Schartner and Driesch determined that

Plaintiff's complaints against Jabari were unsubstantiated.  (Id. Ex. 2 (Schartner

Dep. at 129.)  During a telephone conversation in early February 2014 between

Plaintiff, BAMC Regional Vice President Mark LaChance and Schartner about

Plaintiff's letter to Gorman, Plaintiff, for the first time, informed BAMC that he

suffered from PTSD.  (Id. Ex. 3 (LaChance Dep. at 37-38, 79-80).)  Thereafter,

BAMC made the decision to terminate Plaintiff's employment for violation of

BAMC's Zero Tolerance Policy.  (Id. Ex. 3 (LaChance Dep. at 84).)  BAMC asserts

Plaintiff violated this policy by telling Driesch and another manager that he

would rather work with "Bible thumpers" at Northwestern College than "pagan

sons and daughters of the rich and powerful" at Macalester.  (Id. Ex. 1 (Driesch

Dep. at 124-25, 138); Ex. 11.)  Another violation involved the letter Plaintiff wrote

to Gorman which included statements in which Plaintiff referred to someone as a

"Satan worshipper" and that he was ordered to kill one of the Presidents of the

United States.  (Id. Ex. 11.)  Finally, BAMC determined that Plaintiff's comments

and behavior during work created an uncomfortable work environment for other

BAMC employees.  (Id.)

## II.  Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir.  1995).

## III.    Discussion

### A.    Disability Discrimination

The elements of a prima facie case of disability discrimination are: 1)

Plaintiff is disabled as defined by the ADA; 2) he is qualified to perform the

essential functions of the job, with or without reasonable accommodation; and 3)

he has suffered an adverse employment action due to his disability.  Pittari v.

American Eagle Airlines, Inc., 468 F.3d 1056, 1061 (8th Cir. 2006).[2]  Once Plaintiff

---

[2]Claims asserted under the ADA and the MHRA are evaluated under the same
standards.  Phillip v. Ford Motor Co., 328 F.3d 1020, 1023 n. 3 (8th Cir. 2003).

demonstrates a prima facie case of disability discrimination, the burden shifts to

BAMC to articulate a legitimate, non-discriminatory reason for the adverse

action.  Willnerd v. First Nat'l Nebraska, 558 F.3d 770, 778 (8th Cir. 2009).  If

BAMC meets this burden, the burden of proof shifts to Plaintiff "to discredit

[BAMC's] stated reasons for terminating him and show circumstances raising a

reasonable inference that the real reason for his discharge was his . . . disability."

Id.

### 1.      Prima Facie Case

To show that he is disabled, Plaintiff must show that 1) he has a physical

sensory or mental impairment that substantially limits one or more major life

activity; 2) has a record of such impairment; or 3) is regarded as having such an

impairment.  42 U.S.C. § 12102.

Plaintiff alleges that he suffers from PTSD which substantially limits the

major life activities of sleeping, thinking and interacting with others.  The ADA

regulations address PTSD as follows: "it should easily be concluded that the

following types of impairments will, at a minimum, substantially limit the major

life activities indicated: . . . post-traumatic stress disorder . . . substantially limit[s]

brain function."  29 CFR § 1630.2(j)(3)(iii).

15

While recent amendments to the ADA were enacted to ensure the Act would be construed to provide broad coverage, the amendments were not intended to create a free pass for plaintiffs with no evidence of a disability. See Tramp v. Assoc. Underwriters, Inc., 768 F.3d 793, 804 (8th Cir. 2014) ("[T]hough the ADAAA makes it easier to prove a disability, it does not absolve a party from proving one.") (quoting Neely v. PSEG Tex. Ltd. P'ship, 735 F.3d 242, 245 (5th Cir. 2012).

Here, there are no medical records or expert reports which show that Plaintiff has either been diagnosed with, or has been treated for, PTSD. As noted above, the only medical records that mention PTSD reference the disorder in the medical history portion of the records, which appears to be based on Plaintiff's self-reports to the medical professional completing the medical record. (Id.)

In addition to the lack of medical records substantiating a PTSD diagnoses or treatment, the record does not support Plaintiff's claims as to the cause of his PTSD. There is no evidence to substantiate his claim that he served in the military. In fact, on his employment application for BAMC, Plaintiff indicated he was a non-veteran. There is also no evidence to substantiate his claim that he was part of a CIA mind control program, with the exception of his self-serving

deposition testimony.

Plaintiff argues that medical evidence is not necessary to prove he has a disability and that it is sufficient if he can show how his mental health condition substantially limits major life activities, including sleeping, thinking, and interacting with others.  See Palacios v. Continental Airlines, Inc., No. H-11-3085, 2012 WL 499866, at *4 (S.D. Tex. Feb. 11, 2013).

The Court finds that Plaintiff's reliance on Palacios is misplaced.  There, the court held that the plaintiff's self-described severity of his depression and its adverse effects on his desire to work, **along with some medical evidence**, was enough to meet the lenient standards set forth in the ADAAA.  Id. 2012 WL 499866, at *4.  In this case, the only evidence Plaintiff points to are self-reports that are included in medical reports concerning conditions other than PTSD.

Plaintiff further asserts that he need not provide a formal diagnosis to prove the cause of his mental illness, citing the decision in Hutchinson v. Ecolab, Inc., Case No. 3:09cv1848, 2011 WL 4542957, at *9 (D. Conn. Sep. 28, 2011). Hutchinson is factually distinguishable, however.

In Hutchinson, the plaintiff's doctors were not able to diagnose the underlying cause of plaintiff's symptoms, yet plaintiff had extensive medical

documentation of his symptoms, including doctor's notes specifying that the plaintiff was unable to perform certain work required by his job.  Id. 2011 WL 4542957, at *2-4, 8.  By contrast, in this case there is no documentation by medical professionals to put BAMC on notice of Plaintiff's condition.

Plaintiff further asserts that his PTSD was open and obvious to everyone who came into contact with him, therefore it cannot be seriously disputed that he was a qualified individual with a disability.  In support, Plaintiff cites to the Willnerd decision where the plaintiff suffered from a voice condition that limited his ability to speak in a normal or controlled tone, and was fired from his position as a loan officer/sales representative that required substantial interaction with the public.  Based on those facts, the court determined that "it is either undisputed or not seriously disputed that [plaintiff] was a disabled individual, qualified within the meaning of the ADA." Id. 558 F.3d at 778.

In this case, however, BAMC does dispute whether it had knowledge of Plaintiff's disability.  Further, an alleged mental disability is not necessarily as obvious as a physical disability and the ADA places the burden on Plaintiff to inform his employer that he has a disability and that he needs accommodation. Miller v. Nat'l Cas. Co., 61 F.3d 627, 629-30 (8th Cir. 1995).  Other than claiming

that he suffered from PTSD during the investigation into the letter he wrote to

Gorman, there is no evidence Plaintiff informed BAMC that he had a disability or

that he required accommodation.

Plaintiff further argues he has demonstrated he has a record of a disability,

which is defined as an "individual who has a history of, or has been misclassified

as having, a mental or physical impairment that substantially limits one or more

major life activity."  29 C.F.R. § 1630(k)(1).  Plaintiff asserts he has presented

medical records, charges and a probable cause finding and his own handwritten

notes indicating that he has a historical diagnosis of PTSD.  As discussed above,

however, the only references to PTSD in the two medical records submitted are

not sufficient to demonstrate a PTSD diagnoses or treatment.  There is also no

evidence in the record demonstrating that he was misclassified as having a

disability that substantially limits a major life activity.

Finally, Plaintiff argues that BAMC regarded him as disabled, because he

was terminated based on an actual or perceived mental impairment, whether or

not the impairment limits or is perceived to limit a major life activity.  In support,

Plaintiff claims that Schartner and LaChance admitted in their depositions that

Plaintiff may need professional help and that the comments in the letter to

Gorman were delusional.  These comments, together with the fact that it is undisputed that Plaintiff told them he believes he suffers from PTSD prior to his termination, demonstrates that BAMC regarded him as disabled when the decision was made to terminate his employment.

BAMC denies that it regarded Plaintiff as disabled at any time prior to his termination.  But assuming without deciding that it did regard Plaintiff as disabled at the time the decision was made to terminate his employment, the Court nonetheless finds that Plaintiff is not entitled to summary judgment on his disability claims as he failed to prove, or demonstrate fact questions as to the issue of pretext.

### 2.      Pretext

To prove pretext, Plaintiff must discredit BAMC's asserted basis for his discharge and further demonstrate that the circumstances surrounding his termination raise a reasonable inference that the real reason for his discharge was his disability.

BAMC's asserted reason for discharging Plaintiff was because he violated BAMC's Zero Tolerance policy.  The record demonstrates that in response to Plaintiff's complaint of harassment by coworker Jabari, BAMC took steps to

investigate the complaint.  Shortly thereafter, Plaintiff handed his letter to Terry

Gorman, head of Macalester Security, which included a number of comments that

prompted Gorman to write a letter to BAMC, recommending that Plaintiff no

longer work at Macalester College.  One such comment referred to a coworker

"cursing him in the name of Satan" and that "He comes from Hati [sp] or Africa

or somewhere.  I pretty sure he comes from HELL."  (Graham Aff. Ex. 9.)  Plaintiff

requested a transfer to another school, but in doing so, made insensitive remarks

about Bible thumpers and pagan sons and daughters of the rich and powerful.

Because such comments indicate a bias based on religion or even national origin

about the staff and student body at Macalester, BAMC determined that his

comments violated the Zero Tolerance Policy.  (Id. Ex. 11.)

Plaintiff argues that even accepting as true that Plaintiff did violate BAMC's

Zero Tolerance Policy, BAMC is nonetheless liable under the ADA and the MHRA

where there is also a discriminatory reason for discharging an employee.

McGrath v. TCF Bank Sav. FSB, 502 N.W.2d 801, 806 (Minn. Ct. App. 1993) (citing

Anderson v. Hunter, Keith, Marshall & Co., Inc., 417 N.W.2d 619, 627 (Minn. 1988)

("[E]ven if an employer has a legitimate reason for the discharge, a plaintiff may

nevertheless prevail if an illegitimate reason 'more likely than not' motivated the

discharge decision."))  Plaintiff claims that the record is undisputed that his

termination was motivated by his disability.  In the termination letter, one of the

articulated bases for finding Plaintiff violated the Zero Tolerance Policy was that

Plaintiff's comments and behavior created an uncomfortable work environment

for other employees.  (Graham Aff. Ex. 11.)   Plaintiff asserts this is clear evidence

that the termination decision was based on an unlawful prejudice, stereotype or

unfounded fear as a result of BAMC's awareness of Plaintiff's disability.

The Court finds that based on the record as a whole, Plaintiff cannot

demonstrate that discrimination played a part in Plaintiff's termination.  Plaintiff

was terminated because he made inappropriate comments about the students and

coworkers at Macalester College by calling them "pagan sons and daughters of

the rich and powerful" and by stating that Jabari "comes from HELL."  Such

statements go beyond Plaintiff merely discussing his own religious beliefs.

Plaintiff admits he wrote the letter to Gorman, but tries to recast the reason

he wrote it - that he was requesting aid because he believed he was in physical

danger due to Jabari's harassment.  The fact remains that Plaintiff included in the

letter unsettling comments about his colleagues and other topics, such as killing

Presidents of the United States.

The ADA does not protect employees from the consequences of violating

conduct requirements, even where the conduct is caused by disability.  See EEOC

Enforcement Guidance: Applying Performance and Conduct Standards to

Employees with Disabilities, at Question 9; see also Hamilton v. Sw. Bell Tel. Co.,

136 F.3d 1047, 1052 (5th Cir. 1998); Adams v. Rochester Gen. Hosp., 977 F. Supp.

226, 236 (W.D.N.Y. 1997).

Here, the record is undisputed that Plaintiff engaged in conduct that

violated BAMC's Zero Tolerance Policy.  Because Plaintiff has failed to discredit

BAMC's asserted reason for his discharge and has failed to demonstrate the

circumstances surrounding his termination raise a reasonable inference that the

real reason for his discharge was his disability discrimination, BAMC is entitled to

summary judgment on the disability discrimination claims.

## B.    Retaliation/Reprisal

To establish a prima facie case of retaliation, Plaintiff must show: he

engaged in statutorily protected conduct; a reasonable person would have

perceived the alleged retaliatory action to be materially adverse; and a causal

connection exists between participation in the protected activity and the adverse

employment action.  Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 752 (8th Cir.

2009).  If Plaintiff establishes a prima facie case of retaliation, the burden then

shifts to BAMC to produce a legitimate, non-retaliatory reason for its employment

actions.  If BAMC meets its burden, then Plaintiff must prove that BAMC's

reasons are a pretext for discrimination.  <u>Clegg v. Arkansas Dep't of Corr.</u>, 496

F.3d 922, 928 (8th Cir. 2007) (noting that the <u>McDonnell Douglas</u> framework was

to be used to analyze the plaintiff's retaliation claim).  To prove pretext, Plaintiff

must both discredit BAMC's asserted reasons for its employment actions and

show the circumstances permit drawing a reasonable inference that the real

reason for the employment decision was retaliation.  <u>Gilbert v. Des Moines Area</u>

<u>Comm. Coll.</u>, 495 F.3d 906, 918 (8th Cir. 2007).  There is no dispute that Plaintiff

engaged in protected conduct when he complained of harassment by coworkers,

both internally and with the St. Paul DHR.

To prove a causal connection between his protected conduct and his

termination, Plaintiff points to the deposition testimony of Mark LaChance, in

which he admitted he had a problem with Plaintiff reporting discriminatory

conduct to Macalester College campus security.  In addition, BAMC states it had a

problem with the manner in which Plaintiff requested a transfer to Northwestern

College and to statements he made during the investigation into his complaint

against Jabari about Satan.  Plaintiff argues that because the statements which

form the basis for his termination were made in his written complaints about

discrimination and in response to BAMC's questions during the investigation,

those statements are protected and cannot be the reason for his termination.  <u>See</u>

<u>generally</u>, <u>Crawford v. Metro. Gov. of Nashville and Davidson Cnty. Tenn.</u>, 129 S.

Ct. 846 (2009) (finding that anti-retaliation provision of Title VII extends to an

employee who speaks out about discrimination not on her own initiative, but in

answer to questions during an employer's internal investigation); <u>see</u> <u>also</u>

<u>Womack v. Munson</u>, 619 F.2d 1291 (8th Cir. 1980) (finding that because the

plaintiff's admission to the abuse occurred during the investigation of his report,

the admission is inseparable from the protected conducted and such admission is

therefore protected conduct).  The Court disagrees.

Unlike the facts at issue in <u>Womack</u>, Plaintiff's termination was not "so

inextricably related to the allegation in the complaint that they cannot be

considered independently of one another."  <u>Womack</u>, 619 F.2d at 1297.  The

statements and comments which form the basis for the discharge decision may

have been made during the investigation of his claims against Jabari, but such

comments and statements are completely unrelated to the claims of harassment

and can be considered independently.

The record is undisputed that BAMC conducted a full investigation into Plaintiff's harassment complaint, and determined that Plaintiff had violated BAMC's Zero Tolerance Policy by making comments which created a hostile working environment based on insensitive remarks related to religion - referring to Bible thumpers and pagan sons and daughters - and national origin - referring to Jabari as being from Haiti or Africa, or Hell or some other dark place, and referring to him as a Satan worshipper. (Graham Ex. 11.)  See Brown v. City of Jacksonville, No. 4:10CV001637, 2012 WL 604218 *3 (E.D. Ark. Feb. 24, 2012) (finding that plaintiff had failed to demonstrate retaliation for filing complaint with EEO, where internal investigation into plaintiff's allegations of discrimination and retaliation revealed that the plaintiff, through her own actions and inactions, had created a hostile working environment in violation of employer policy).

BAMC is thus entitled to summary judgment as to Plaintiff's claims of retaliation or reprisal.

IT IS HEREBY ORDERED that:

1.    Defendant Bon Appetit Management Company's Motion for

Summary Judgment [Doc. No. 31] is GRANTED in its entirety; and

2.      Plaintiff's Partial Motion for Summary Judgment [Doc. No. 36] is

DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date:   October 21, 2015

                                        s/ Michael J. Davis
                                        Michael J. Davis
                                        United States District Court